UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| JESSICA MCGILL ADAMSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil A. No. 16-12630-LTS |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

March 27, 2018

SOROKIN, J.

The plaintiff, Jessica McGill Adamson, seeks reversal and remand of a decision by the defendant, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying her Disability Insurance Benefits ("DIB"). Doc. No. 16. The Commissioner seeks an order affirming her decision. Doc. Nos. 17, 18. For the reasons that follow, Adamson's Motion to Reverse is DENIED, and the Commissioner's Motion for Order Affirming the Decision is ALLOWED.

I. BACKGROUND

A. Procedural History

In March of 2014, Adamson applied for DIB, alleging that she became disabled on

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill has been substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this action.

1

March 11, 2013. A.R. at 255-56.[2] Her application was denied initially on April 8, 2014, A.R. at 200-02, and again upon reconsideration on July 25, 2014, A.R. at 207-09. On August 18, 2014, Adamson requested a hearing before an administrative law judge ("ALJ"). A.R. at 210. Adamson appeared, represented by counsel, and testified at her November 10, 2015 hearing, which also featured testimony by a vocational expert Diane Durr. A.R. at 150-177.

Thereafter, the ALJ issued a written decision denying Adamson's application. A.R. at 10-27. Adamson's timely request for review by the Appeals Council was denied, A.R. at 1-6, rendering the ALJ's determination the final decision of the Commissioner. Adamson filed this action appealing the Commissioner's decision on December 28, 2016. Doc. No. 1.

B. <u>Adamson's Physical Impairments</u>

In the paperwork accompanying her applications, Adamson claimed she suffered from physical impairments, including loss of function from surgery, weakness, fatigue of limb, pain spikes, numbness, loss of sensation of wrist and hand, and sensitivity to touch and objects.[3] A.R. at 282. The administrative record contains the following relevant evidence regarding Adamson's alleged physical impairments:

- Adamson worked as a cashier at a restaurant and as a cashier and deli worker at a convenience store. A.R. at 162-63. She asserts that on November 14, 2011, she sustained a work-related injury to her right hand and received preliminary

---

[2] Citations to "A.R." are to the administrative record, which appears as Document 11 and its attachments on the docket in this matter. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

[3] Adamson also cited depression and PTSD. The ALJ did not find any of these ailments to be severe, A.R. at 16, and, in this action, Adamson has not challenged the ALJ's assessment of those impairments. As such, the Court need not catalogue that portion of the record or review the ALJ's findings in that regard here.

2

treatment at the Falmouth Hospital emergency room. Doc. No. 16 at 4; A.R. at 154. Adamson testified that she stopped working in 2012. Id.

- On December 13, 2011, Adamson visited the Falmouth Hospital emergency room complaining of increased pain in her right wrist after having rolled onto it the night before. A.R. at 359. She received a radiograph of her right wrist, which indicated "[w]idened scapholunate interval suggesting ligament disruption." A.R. at 357. Emergency staff diagnosed Adamson with tendonitis (De Quervain's tenosynovitis) and instructed her to take ibuprofen. A.R. at 361, 363.

- At the instruction of her primary care physician, Adamson obtained an MRI of her right wrist in January 2012. The results of the MRI indicated "disruption of the scapholunate ligament and widening of distance between the scaphoid and lunate." A.R. at 345-349, 351.

- In March 2012, Adamson visited the emergency center at Cape Cod Hospital complaining of persistent pain and swelling in her right arm, which she described as more severe than her prior symptoms and prohibitive of work. A.R. at 144-146. Emergency staff observed "right wrist tenderness with palpation diffuse" and "weakness and limited [range of motion.]" A.R. at 145. Adamson was prescribed Vicodin and instructed to consult an orthopedic specialist. A.R. at 146.

- Adamson asserts that she received conservative treatment from orthopedic physician Dr. Jason Fanule in July 2012. Doc. No. 16 at 4. The administrative record does not include information about this treatment.

- In October 2012, orthopedic surgeon Dr. Jeffrey L. Zilderfarb completed a one-time impartial examination of Adamson for the Massachusetts Department of Industrial Accidents. A.R. at 478-79. Dr. Zilderfarb found "limited range of motion of the wrist with tenderness to palpation" and diagnosed "[p]robable scapholunate ligament tear with de Quervain's tendinitis." Id. Dr. Zilderfarb concluded that Adamson "is capable of light duty work that does not involve lifting more than two pounds with the right wrist and no repetitive use of the right arm." Id.

- In February 2013, Adamson first visited orthopedic surgeon and hand and upper extremity specialist Dr. Hillel Skoff. A.R. at 452-53. Dr. Skoff determined that surgical intervention was appropriate but explained to Adamson that he should only perform the surgery after she had recovered from a pulmonary embolism for which she then was being treated. Id.

- In August 2013, Dr. Skoff performed right wrist first dorsal compartment release and a capsulorrhaphy and ligament reconstruction on the right wrist. A.R. at 457.

- In September 2013, Dr. Skoff placed Adamson into a short-arm cast and instructed her to perform range of motion exercises. A.R. at 449. In December 2013, Dr. Skoff removed Adamson's cast and prescribed mobilization and strengthening exercises and occupational therapy. A.R. at 446.

- After a follow-up visit in January 2014, Dr. Skoff reported that Adamson's physical therapist had not been covering all of the exercises that Dr. Skoff had recommended. A.R. at 445. He instructed Adamson to communicate to the

4

therapist "to be more aggressive" with these exercises. Id.

- Following a March 2014 examination, Dr. Skoff noted that "[Adamson's] preoperative pain level as well as her functional level have improved by virtue of the operations, but her range of motion remains somewhat deficient." A.R. at 454. He observed that "[s]he has improved over time" but that "her main issues have been scarring after the procedure while limiting motion relative to both of these procedures." Id. Dr. Skoff discussed scar-cutting treatment with Adamson, but otherwise communicated to her that "she has reached an end result with respect to treatment to date." Id.

- In April 2014, a state agency physician, Dr. Richard Cohen, completed a Residential Functional Capacity Assessment of Adamson. A.R. at 178-185. He opined that Adamson could perform light work but needed to avoid ladders completely and engage in only occasional fine and gross manipulations of the right hand because of her right wrist problem. Id.

- In July 2014, state agency reviewing physician Dr. Barbara Trockman affirmed Dr. Cohen's assessment at the reconsideration stage. A.R. at 187-98.

- On July 30, 2014, Adamson returned for an examination by Dr. Skoff and reported new pain in the right wrist. However, Dr. Skoff found "no overt manifestation of a wrist problem"; "no change in the reconstructive anatomy"; and "no new source of discomfort" despite Adamson subjectively being "quite symptomatic." A.R. at 500. Dr. Skoff gave Adamson injections at the ultnocarpal joint. Id. Adamson testified at the hearing before the ALJ that she stopped visits to Skoff after he indicated to her at this visit that "there wasn't

5

anything he could do if it wasn't surgery related[,]" A.R. at 167-68, and that, after Adamson's surgery, Skoff never prescribed medication beyond over-the-counter pain medication, A.R. at 173.

- At an August 2014 primary care visit, Adamson reported "arthralgias/joint pain" and tenderness in her right wrist, but "no muscle aches, no muscle weakness […] and no swelling in the extremities." A.R. at 504-07.

- At a January 2015 primary care visit, Adamson reported no upper extremity problems. A.R. at 502-04.

- Adamson testified at the hearing before the ALJ that she visited the emergency room in July 2015 for arm pain upon waking and that she was prescribed an aspirin-based anti-inflammatory, which she took for about one month. A.R. at 156-57. The administrative record does not otherwise document this visit.

- In July 2015, Adamson returned to work, this time as an Avis representative at a car rental agency. A.R. at 154. Her work required her to operate a computer and a telephone. A.R. at 168. She worked at this job between 16 and 30 hours a week until September 2015, when the agency terminated her employment for reasons unrelated to her impairments. A.R. at 161-62. Adamson testified that her termination occurred after she already had decided to leave work because of her hand pain. A.R. at 154, 161-62.

- Adamson returned to the emergency room at Falmouth Hospital in September 2015. A.R. at 517-19. She complained of bilateral wrist and forearm pain "for the past few days" of unknown cause. Id. Emergency room personnel diagnosed Adamson with carpal tunnel syndrome and prescribed a ten-day

6

course of an anti-inflammatory (Voltaren). Id. Adamson testified that her primary care provider subsequently prescribed Lyrica at a follow-up visit. A.R. at 156-57, 341.

- In October, neurologist Dr. Leahy completed a one-time examination of Adamson. A.R. at 564-67. Leahy described her right-side symptoms as "swelling in the [right] hand"; "pain in the wrist"; "loss of feeling in her small finger, advancing to her middle finger, then involving the thumb and index finger"; and "discomfort [radiating] up into her elbow […] occur[ring] randomly, when she is sitting or at rest." Id. Additionally, Leahy observed that Adamson had "more recently developed similar pain in her left hand" and that "[s]he find that gripping can bring out the pain on that side" for episodes "as short as 20 minutes or as long as three days[.]" Id.. Leahy concluded: "History, physical examination, and nerve conduction studies do not provide a definitive diagnosis for her bilateral hand and wrist discomfort." Id. He specifically ruled out carpal tunnel syndrome, ulnar neuropathy, and cervical radiculopathy. Leahy suggested that Adamson's persistent pain, swelling or color, and temperature change might indicate CRPS, for which "[t]here is not test which will clearly prove or disprove the diagnosis." Id. Dr. Leahy prescribed no medication or course of action other than overnight splinting. Id.
- Adamson has described "having problems with more frequent and severe pain and spasms" and "dropping items more" since her surgery. A.R. at 318 (July 2014 Functions Report). Adamson does not drive vehicles because of her hand impairments and has not driven a vehicle since her injury. A.R. at 163-64. She

7

does house chores, including dishes, sweeping, mopping, and taking care of two pet ferrets. A.R. at 164-65. She also spends up to 20 minutes at a time on her computer. A.R. at 164. She maintains that she has been "physically incapable of performing any substantial gainful activity" other than her two months of resumed employment. A.R. at 154.

    C.    <u>The Administrative Decision</u>

After determining that Adamson met the insured status requirements of the Social Security Act during the relevant time period, the ALJ conducted the usual five-step sequential evaluation to determine whether Adamson is disabled within the meaning of the Social Security Act.[4] See A.R. at 14-15 (describing the five-step analysis required by the Social Security Act). At step one, the ALJ found that Adamson had not engaged in substantial gainful activity since the date on which she alleges her disability began. A.R. at 15. At step two, the ALJ found that Adamson suffers from severe status post right wrist surgery. A.R. at 16. At step three, the ALJ found that that Adamson's impairment did not meet or medically equal the severity of one of the impairments listed in the relevant appendix to the regulations, A.R. at 16, a finding that Adamson does not dispute here.

After step three, the ALJ considered Adamson's residual functional capacity ("RFC")[5]

---

[4] The five steps of the requisite analysis are: 1) whether the claimant is engaged in substantial gainful activity (if so, she is not disabled and the inquiry ends); 2) whether the claimant has a severe impairment or combination of impairments that is severe (if not, she is not disabled and the inquiry ends); 3) whether any of the claimant's impairments meet or medically equal an impairment listed in an appendix to the relevant regulations (if so, she is disabled and the inquiry ends); 4) whether the claimant is able to perform her past relevant work (if so, she is not disabled and the inquiry ends); and 5) considering the claimant's age, education, work experience, and RFC, whether she is able to perform other work (if not, she is disabled). See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

[5] An individual's residual functional capacity is her ability to do physical and mental work

and found that Adamson "has the residual functional capacity to perform sedentary work"[6] except that she "can lift no more than 5 pounds with the right upper extremity, could occasionally push and pull with the right upper extremity, occasional [sic] climb stairs, but no climbing ladders, occasional balancing, stooping, kneeling, and crouching, but no crawling, and only occasional gross manipulation with the right upper extremity." A.R. at 16. In reaching her conclusion, the ALJ considered Adamson's testimony about her symptoms, "objective medical evidence," and, most relevant to Adamson's Motion to Reverse, medical opinions from Adamson's treating physicians. A.R. at 16-17. The ALJ determined that Adamson suffered severe impairments. However, the ALJ found that Adamson's statements about her symptoms were "not entirely credible[,]" because "the objective medical evidence and the record as a whole do not support that the claimant experiences limitations that are as significant as alleged." A.R. at 17.

In determining Adamson's RFC, the ALJ summarized the record with respect to Adamson's December 2011 reports of pain after her November 2011 injury; her January 2012 MRI; treatment notes through July 2012 about her right wrist; her October 2012 examination by Dr. Zilberfarb; her initial visit and May 2013 follow-up visit with hand specialist Dr. Skoff; the August 2013 surgical procedures on her right wrist; post-surgery follow-up examinations by Dr. Skoff; her completion of physical therapy; July and August 2014 examinations of her right wrist; the gap in the treatment record until an emergency room visit

---

activities on a sustained basis despite limitations from her impairments. 20 CR 404.1520(e), 404.1545, 416.920(e).

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R §§ 404.1567(a); 416.967(a).

in September 2015; and finally, the October 2015 neurology evaluation by Dr. Leahy. A.R. at 18-20. The ALJ observed:

> Dr. Leahy noted that the claimant did not have carpal tunnel syndrome, ulnar neuropathy, or any suggestion of cervical radiculopathy. He also indicated that pain at injury site could be described as complex regional pain syndrome, but there is no way to prove or disprove the diagnosis and that the claimant had similar symptoms in her uninjured left hand. He assessed the claimant with unexplained left side symptoms, possible intermittent median nerve irritation below threshold of the EMG study, and maybe intermittent wrist or epicondylar problems not evident. The claimant was advised to use over-night splinting as that might be helpful and to follow-up as needed.

A.R. at 19-20. The ALJ indicated that she gave less weight to the two non-examining state agency consultants and to Dr. Zilberfarb, who evaluated Adamson only once. The ALJ gave no further explanation of the weight that she assigned to Dr. Leahy's assessment.

With the RFC determination in mind, as well as the testimony of the vocational expert, the ALJ concluded at step four that Adamson was unable to return to her past work as a cashier or deli worker. A.R. at 21. At step five the ALJ considered Adamson's age, education, work experience, and RFP, as well as the vocational expert's testimony. The ALJ determined that Adamson would be able to perform the requirements of representative occupations such as credit checker, referral clerk, or telephone solicitor. A.R. at 22. Accordingly, the ALJ concluded that Adamson is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy[,]" such that Adamson had not been under a disability, as defined in the Social Security Act, from the date of the alleged onset through the date of the ALJ's decision. A.R. at 23.

II. <u>LEGAL STANDARDS</u>

The District Court may enter "a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Id. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." Richardson v.Perales, 402 U.S. 389, 401 (1971); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (noting substantial evidence is less than a preponderance of the evidence). Conversely, where the Commissioner's finding is not supported by substantial evidence or is the result of an error of law in the evaluation of the claim, the Court will not uphold it. § 405(g).

Where the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991); see Richardson, 402 U.S. at 399 (noting resolution of conflicts in evidence, including medical evidence, is the Commissioner's task). As the Supreme Court has emphasized, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981) (internal quotations omitted). Administrative findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). Moreover, an ALJ is not permitted to "substitute his own layman's opinion for the findings and opinion of a physician," Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987), nor may she disregard relevant medical evidence, Nguyen, 172 F.3d at 35.

11

Under the regulations in effect at the time of the ALJ's December 2015 decision, medical opinions are "statements from physicians […] that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (Aug. 24, 2012). Those regulations further provide: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2) (Aug. 24, 2012).[7]

III.  DISCUSSION

Adamson contends that the ALJ's determination was not supported by substantial evidence and contrary to law and regulation. Doc. No. 1 ¶ 7.

A.  ALJ's Weighing of Dr. Leahy's Assessment

Adamson primarily argues that the ALJ "failed to grant controlling weight to the Plaintiff's treating physicians in her finding that the Plaintiff's Chronic [sic] Regional Pain Syndrome does not prevent her from having the functional capacity to perform a full range of sedentary work." Doc. No. 16 at 3. She urges that the ALJ's assessment was inadequate because the ALJ failed to weigh properly Dr. Leahy's full opinion and instead relied on Leahy's note that "there was no way to prove or disprove the diagnosis" of CRPS. Doc. No. 16 at 5.

---

[7] For treating source opinions that are not entitled to controlling weight, the regulations describe factors relevant to the weight that an opinion should be given. See 20 C.F.R. § 404.1527(c)(2)(i) and (c)(2)(ii) (length of the treatment relationship, frequency of examination, and nature and extent of treatment relationship) and (c)(3) through (c)(6) (supportability and consistency of opinion(s), specialization of the opinion giver, and other factors) (Aug. 24, 2012).

12

Adamson stresses that "[a] simple dismissal of the diagnosis simply because the doctor indicated that there is no specific diagnostic test that can prove or disprove CRPS is not giving proper weight to the actual severity of the diagnosis." Id.

The Commissioner contends that the ALJ's analysis of Dr. Leahy's opinion meets the substantial evidence standard because "a reasonable mind" would not be required to accept a CRPS diagnosis based on the administrative record. Doc. No. 18 at 10. The Court agrees.

As an initial matter, only a generous reading of Dr. Leahy's treating notes permits the conclusion that Dr. Leahy made a diagnosis of CRPS, much less an unqualified one. Leahy found that both Adamson's history and Leahy's examination and nerve conduction studies "do not provide a definitive diagnosis for [Adamson's] bilateral hand and wrist discomfort." A.R. 155-56. Leahy noted that Adamson described "possible complex regional pain syndrome." Id. (emphasis added). He made passing reference to CRPI in his assessment:

> Persistent pain after injury is often described as a complex regional pain syndrome, particularly when there are elements of swelling or color and temperature change. There is no test which will clearly prove or disprove the diagnosis.

Id. However, Leahy also posited that Adamson "may have intermittent median nerve irritation below the threshold or measurement for my studies." Id. Neither of these conjectures rises to the level of an actual diagnosis. Indeed, the ALJ concluded that Leahy was "unable to provide any diagnosis for the claimant's subjective complaints[.]" A.R. at 20.

Further, even if accepted as a diagnosis, Dr. Leahy's finding of CRPS would not be entitled to controlling weight under the relevant regulations. First, Dr. Leahy gave no opinion on the severity of Adamson's case of CRPS for purposes of a benefits determination. See 20 C.F.R. § 404.1527(c)(2) (Aug. 24, 2012) (describing controlling weight preconditions for a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)") (emphasis

13

added). Moreover, Dr. Leahy's explanation of the indeterminable nature of CRPS undermines any claim that his finding is "well-supported by medically acceptable clinical and laboratory diagnostic techniques[,]" as the regulations require. Id.

The ALJ gave proper weight to Dr. Leahy's evaluation as one data point in the administrative record as a whole. The treating relationship was insubstantial; Dr. Leahy examined Adamson once, more than two years after Adamson's alleged disability onset. No other medical source of record raised the possibility that Adamson's impairments stemmed from CRPS. Nonetheless, the ALJ probed Adamson on whether Dr. Leahy gave Adamson any prescription or instructions and what Dr. Leahy's testing of Adamson's arms revealed. A.R. at 159. Adamson answered that Leahy's testing indicated that she did not have carpal tunnel and that "outside from that [Dr. Leahy] didn't know anything[.]" Id. Adamson elaborated that she had visited Dr. Leahy because her primary care provider "simply […] wanted [Leahy] to test to see if the emergency room gave [Adamson] a proper diagnosis." A.R. at 160. She otherwise had expected to visit a more specialized, muscle/skeletal neurologist upon referral by her primary care provider. Id. Based on Adamson's characterization of Dr. Leahy's examination, the ALJ expressed uncertainty at needing Dr. Leahy's report but pledged to wait for Adamson to provide that report before issuing a decision anyways. A.R. at 175. Especially in light of the volume of records from other treating physicians, which suggest alternative diagnoses and document the progression of Adamson's impairments over time, the ALJ's weighing of Dr. Leahy's assessment was reasonable.

    B.    <u>Additional Claims</u>

Adamson briefly raises several additional arguments.

First, Adamson claims that the ALJ's decision failed to give proper credit to Adamson's

testimony about her pain and limitations. The ALJ considered Adamson's subjective testimony, but concluded that her "allegations that her impairments adversely affect her activities and ability to work are considerably more restrictive than what is established by the medical record evidence and the record as a whole." Doc. No. 11-2 at 21. An ALJ's adverse assessment of a claimant's credibility "is given considerable deference and, accordingly, a reviewing court will rarely disturb it." Ferreira v. Astrue, No. CIV.A. 10-11983-NMG, 2012 WL 1085522, at *7 (D. Mass. Mar. 29, 2012); accord Genereux v. Berryhill, No. CV 15-13227-GAO, 2017 WL 1202645, at *5 (D. Mass. Mar. 31, 2017) ("[T]he ALJ's credibility determination is entitled to deference") (quotations omitted).

Here, the ALJ's assessment is supported by the medical record, which documents conservative treatment (with a one-year period of no treatment), improvement in Adamson's condition over time, her discharge from physical therapy, a period of returning to work, and the inability of Adamson's treating hand physician and examining neurologist to provide any diagnosis based on diagnostic procedures and Adamson's subjective complaints. The ALJ's conclusions are also supported by Adamson's self-reported capabilities; Adamson prepares meals, performs household chores, goes grocery shopping three to four times a month, uses a computer daily, and plays video games. Because the ALJ's assessment of Adamson's credibility is grounded in substantial evidence, the Court does not disturb it.

Next, Adamson suggests that multiple "treating medical sources" rendered a diagnosis of post-surgical CRPS. Doc. No. 16 at 5. However, as already noted, the administrative record does not indicate that any treating professional other than Dr. Leahy suggested to Adamson that her impairments stem from CRPS.

Finally, Adamson claims that the ALJ wrongly based her decision on a gap in Adamson's

medical treatment. Doc. No. 16 at 5. The Court does not read the ALJ's decision to give undue weight to that gap. An ALJ may infer from gaps in a claimant's medical record that a "claimant would have secured more treatment had [her] pain been as intense as alleged." Irlanda Ortiz v. Sec'y of Health & Human Srvs., 955 F.2d 765, 769 (1st Cir. 1991). Here, the ALJ gave the one-year gap in Adamson's treatment appropriate weight in measuring Adamson's testimony against the medical record as a whole.

IV. CONCLUSION

Because the ALJ's determination finds substantial support in the evidence and comports with law and regulation, the Court DENIES Adamson's motion for an order remanding the Commissioner's decision, Doc. No. 16, and ALLOWS the Commissioner's motion for an order affirming that decision, Doc. No. 17.

                                                SO ORDERED.

                                                /s/ Leo T. Sorokin
                                                Leo T. Sorokin
                                                United States District Judge